20-2333 Ghabara v. Facebook. Mr. Gilman, please proceed. May it please the Court, Timothy Gilman on behalf of Thaddeus Ghabara. As this Court and the Supreme Court have repeatedly observed, every invention relates to, uses, embodies an abstract idea. That isn't the question for Section 101. It's not whether you can keep digging deeper and deeper until you hit an abstract idea. The question is whether a claim is directed to an abstract idea, because the 101 inquiry was originally born out of a preemption concern. You don't want patents directed to abstract ideas because you don't want monopolies over the abstract ideas. A couple of key approaches or distinctions for this directed-to test have emerged from this Court and the Supreme Court over the last 10 years from the case law. One of the first key distinctions that's emerged is, for example, if you're in the realm of software inventions, claims that recite novel data structures have generally been found to be patentable versus claims that merely recite data functions or data features, which have generally been found not to be eligible subject matter. If you look at the EnFish case, a self-referential table was found to be a very specific type of data structure and was patent-eligible, as compared to the BSG case where a self-evolving table was found merely to be a feature for a well-known database structure. It was a feature or function. It wasn't a new type of data structure, and it was not patent-eligible. Similarly, if you look at the Unilock case, specialized data packets for the centralized distribution of an application or information could be patent-eligible. But two-way media, the mere idea of multicasting or sending out from a centralized distribution, that function in general is not patent-eligible. Counsel, I appreciate that you're trying hard to create boxes and pigeonhole our 101 cases into those boxes. It would be really great if 101 law was as predictable as you'd like to make it sound like it is. But it's not. But one of the things that you seem to not be acknowledging about both of the cases that you mentioned, ENFISH and the second case, is that in both of them, it wasn't just that, for example, in ENFISH, it was this new data structure, this new way of allocating data, but it was that that new way of allocating data improved the functioning of the computer itself. It made the computer operate more efficiently, use less data, not have to overwrite things as much. So this went directly to an exception carved out by the Supreme Court in this 101 area, which is software that improves the functioning of the computer itself, as opposed to software  And so how is your claimed method improving the function of the computer itself? So starting with the 400 patent claim one, and just to be clear, the claim is not just on a software feature. There are a number of hardware elements, and at the end of the day, the patent is directed to and does improve the functioning of the display on portable devices. So I think we're a few steps removed from just benefiting the computer itself or the function of the computer because it's actually benefiting a concrete device and how the device functions and how images are displayed on the device. So it's not just implementing IDEA on a general-purpose computer, but it's improving not just a general-purpose computer, but here a very specialized structure. And similar to the case in core wireless, where there is a technological problem being addressed, the issue of trying to display large images on small displays and this tension with portable devices that they tend to get smaller, but you want to still be able to access larger displays and larger amounts of information. And the 400 patent claim one shows a specific way of doing that, of how to enable the device to use not just the software. I do think some of the software concepts, the background image of a stationary map, are important. But it's not just that. It's a specific way of using it with the sensors, with inertial sensor measurements, how you map and superimpose images, and doing that to help improve the overall device and the overall function of the device. I think one of the novel data structures in the 400 patent claim one, it's important to recognize that the claims and the specification and the recent PTAB decision point to the importance of this background image of a stationary map limitation as being a key feature of the invention. In the first substantive paragraph of the summary of the invention, the inventor notes that the patent is introducing this concept of a background map that remains stationary on Appendix 237, and this limitation or very close variant is required by every claim. I do think it's important the recent PTAB decision that denied Facebook's IPR petition noted that at least this limitation, this background image of a stationary map, was missing from the prior art. Facebook offered prior art where merely moving a portable device lets you view different portions of an image, the Kim reference that we discussed in the brief. But Kim did it in a different way than the 400 patent, particularly by not having this background image of a stationary map. And I don't think, I understand and appreciate, there aren't bright lines that are emerging from the 101 case law, but I think that this is one inquiry. Is it a new data structure versus is it just a feature? Another way that the court has often looked at it is, is the claim merely claiming a result or is it claiming a means for achieving a result? And recognized in cases like CardioNet or Core Wireless or Macro, that if you look at the claims, is it actually giving you a detailed set of steps as to how to implement and achieve a technological benefit? And then the 400 Claim 1, to start with, is. And it has not just this background image of a stationary map. It's not just covering that concept. It's a specific method to create and use the inertial sensors in an unconventional way to achieve a solution. Council, you mentioned a recent PTAB decision twice. I'm sorry, but I have no idea what decision you're talking about. Did you file a Rule 28J letter with us informing us of some new decision that you thought we needed to be aware of? So this, as briefed in what was submitted already to the court, Facebook had filed petitions for IPR on all five patents subsequent to the district court's ruling on 101. And I think we discussed in our briefs the art and how it played into the 101 analysis here. Very recently, the PTAB denied all five of Facebook's petitions, finding that all five of the patents were patentably distinct from the prior art that Facebook raised. And we would be happy to submit these as supplemental authority. I think that there are a number of cases recognizing that subsequent patent office or PTAB decisions that it's appropriate to take judicial notice of, and so we would be happy to submit those after today. I think turning to the 348 patent, too, the claims and the patent history and the specification and now the PTAB decision as well all show that the finite state machine that's recited in the claims was a core concept for the invention and helped to distinguish the prior art approach. It's recited in all the claims, analyzing and augmenting a conversation specifically by using a finite state machine to select recall topics generated from extracted search parameters. The prosecution history shows that this was a key aspect of the invention that distinguished over the prior art a specific way of doing it. And the recent PTAB decision also relied on this finite state machine and we'll submit that decision to find that Facebook's prior art, an egg in reference, did not render the 348 patent unpatentable because the 348 patent did it in a specific way, did it in a specific way of using this finite state machine. Counselor, with respect to the 348 patent, what would you say is a claimed advance? The claimed advance is specifically using this finite state machine within the field of augmenting conversations, which is a recognized field and there are a number of art references in it, but specifically using this finite state machine to create a state-based approach. As taught throughout the specification, it doesn't always use the term finite state machine, but it's shown throughout the entirety of the spec. The invention defines states for the conversation. It teaches that there are ways to discern what state of conversation, is there silence, is there ongoing conversation, is there an interruption, is there a raised voice? Is the operative word here augment that the results of the claims of the 348 patent? So that users, they can augment the conversation with new information, right? I think that's one of the benefits of the patent, yes. I think the invention has helped. Not a benefit, is that the claimed advance? Not per se. I think the claimed advance is how it's done. The claimed advance is a specific way of doing that augmentation by having defined states based on the state of the conversation and then having, as shown in the flow charts of the specification, specific responses and specific protocols within each state with very defined transitions between the states. And also, none of that's in the claims. Well, that's what is captured by a finite state machine, which is a known structure in the art, which is defined, and I think Facebook and Innisfree has a definition for it that's relatively consistent with what's known in the art, that it's an element that has defined states with specific transitions between those states based on inputs, and the system does something different based on the different states. Well, but if a finite state machine is known in the art, then how can that be your inventive aspect? Because this is a novel use for a finite state machine. It was not used for this kind of conversation augmentation and any of the prior art are known to be used in this way. So it's an unconventional use of a finite state machine. The use is, the result of that use is not novel. The augmentation is not novel. You're saying that this presents a new way towards augmentation. Is that right? There are specific benefits that are unique to this approach. So it's within, maybe within the broader class of augmentation, there are specific benefits that are achieved by using this finite state machine that are, for example, they were pled in the second amended complaint, paragraphs 49 to 50 of appendix 370, that set out specifically how using this finite state machine approach, you were able to achieve results that were not achievable in the prior art and why it's better than the prior art. Counsel, you're into your rebuttal time. Would you like to save the remainder? There are no more questions at this time. I would like to reserve the remainder. Mr. Chomsky, please proceed. Thank you, Your Honor, and may it please the Court, I'm Eric Chomsky and I represent Facebook. Your Honor, let me start with the image patents. These are quintessential do it on a computer patents. Their focus, what they are directed to, is moving a portable device to view a stationary image. And indeed, that's in the title of the 400 patent itself. They simply do it with a portable electronic device rather than with, for instance, a periscope or binoculars. They virtualize the same thing that people do in the real world. And indeed, at page 28 of the opening brief, Mr. Gabbara himself points to the virtualized image as the reason that real world analogies are inapposite. I think that to see why the patents are ineligible, it's useful to look at some of the inquiries that this court has used as a check on abstractness. So, for instance, Mr. Gabbara has said that this is a technological solution to a technological problem. But having a limited field of view or losing your bearings is a human problem, not a technological problem. And the patents are not directed to a technological solution either. They use standard components. They don't improve computer functionality. Chief Judge Moore, you asked a critical question about EnFish and cases like it. And you're absolutely right that in those cases, Core Wireless is another. The court was very clear to emphasize that the patent improved the functioning of the computer itself. And I think it's really telling that my friend on the other side in response to your question says that here, in order to get within those cases, what he says happens is that the patents improve the functioning of the display. But they don't, and they don't do it in the way that this court's cases have talked about. EnFish, at page 1336, talks about a specific improvement in the way computers operate. Electric Power Group at page 1354 looks for an improvement in how computers carry out one of their basic functions of storage and retrieval of data. And here we just don't have anything like that. Moreover, the patents also don't tell you how to achieve the desired result. This is something that the court has emphasized over and over in cases like Electric Power Group and Affinity Labs and Intellectual Ventures 1. You have to explain, and this is a quote from Intellectual Ventures 1 at page 1316, how the result is achieved. But here, all they say is, use a vector. That's circular. It's a truism. Saying that you're using a vector to measure distance and direction is the same thing as saying that in order to decide who wins the 100-meter dash, we're going to measure your time to run 100 meters. Elsewhere, Mr. Gabara says that the image patents are directed to the unconventional use of motion data. But he doesn't identify anything unconventional. He just points to the abstract idea itself, using motion data to view and navigate images. The district court, and this is at Appendix 17, had things exactly right. The patents, quote, employ conventional computer hardware and processes in an ordinary manner to achieve the idea at the heart of the invention. So I'm happy to address any questions that the court might have. If there aren't any, then I'd turn to the 348 patent. So the 348 patent also falls into a very familiar category of ineligible patents, and that's namely patents whose focus is on collecting data, analyzing the data, and displaying the results. And cases like Intellectual Ventures I, which cites a series of these cases at page 1340, and Electric Power Group have emphasized that such patents are quintessentially ineligible. Now, this morning, Mr. Gabara, my friend on the other side, has focused on the finite state machine limitation, but that is a generic structure. If you look at the patent itself, it doesn't describe what that is. It doesn't describe how it is unconventional in any way. And indeed, if you look at the district court briefing, Facebook argued, and this is at Appendix pages 434, 438, and 440, exactly that, that the finite state machine limitation really isn't adding anything at all, that it's just a generic add-on. And in the district court papers, they haven't explained, they didn't explain, they didn't gainsay that at all. Mr. Gabara's response instead on appeal has been that the patent has an inventive concept, and at page 49 of the opening brief, they say that's allowing a computerized device to make a conversation more dynamic and efficient. But again, there's no disclosure of how the desired result is achieved. Again, as the district court put it, and this is at page 23 of the appendix, in essence, the 348 patent lists components from a generic computer that would be useful to carry out the desired task. It does not actually describe how the purported invention works. And again, that's that same critical flaw that this court has pointed to in cases like Electric Power Group and Intellectual Ventures 1. So I'm happy to address the question of representativeness. My friend on the other side did not do so, but unless the court has any questions about that, then I'd be happy to submit on that issue. All right. Thank you, Mr. Shumsky. Mr. Gilman, you have some rebuttal time. Please proceed. Thank you, Your Honor. So starting with the 400 patent Claim 1, if you look at the claim itself and as we walk through in the briefing, there's a lot of disclosure of the specific how, of how the invention is implemented. There is mapping, a first physical point of the display image in the center of the screen to a corresponding reference point in the virtual background image. There's this process of matching and superimposing portions of the display screen over portions of the background image. And yes, there is this idea of using vector movement of the center of the screen as one of the inputs into it, but that doesn't define the invention as not just using a vector to somehow translate the map. It goes into a very specific approach about how you are able to access a large image on a small screen. I think the use of the inertial sensors to help navigate a large image on a portable device is unconventional. A lot of the inertial sensors, you know, for example, in a phone would be used for counting steps or for giving driving directions. This use of the inertial sensors to create a new reference frame for navigating an image on a portable device, I think is comparable to the decision in Thales and the invention at issue in Thales where conventional inertial sensors were used to define a new reference frame for analyzing the motion of a device with respect to a given platform. Council, which claim element of claim 1 of the 400 patent is directed to this novel use of inertial sensors? I would say that it comes up in a couple of different limitations in how they play together. You move the center of the screen, the final element, moving the center of the screen to a new location, defining the first vector. That doesn't necessarily require an inertial sensor. That function can be performed in any way, correct? It would require some measurement and some determination of that. I think there are dependent claims that go into more specificity on the inertial sensor being used to implement that specific limitation. But claim 1 doesn't claim an inertial sensor. It claims any method of achieving that movement. Correct, but the idea of using the movement, using that movement however measured. Isn't the primary way of achieving that movement by tilting the device? Moving the device around? By translating, by the physical movement of the device and using that, translating that physical movement into this new reference. But you use your hands to do that, right? You have claim 1 of the 400 patent says a method of moving a portable unit to search. And just reading the remainder of the patent, it seems that the method of moving a portable unit is with your hands. I believe that. I don't believe that it's meant to encompass human activity. I think the apparatus... No, I know it shouldn't because that, I think you would agree with, is not patent eligible. But that's what the claim says. A method of moving a portable unit, and then I look at the rest of the claim, I don't see anything where it tells me how to do that other than tilting and moving the device around a portable unit. The invention is that when the device is moved, it updates the display. And as the device is moved, it does this. It doesn't require specific movement on behalf of a user. And the apparatus claims are not so limited to requiring a human to do it. It's resetting a structure that is capable of implementing the invention. Okay, thank you both counsel. This case is taken under submission. The Honorable Court is adjourned until tomorrow morning at 10 a.m.